Slip Op. 20-50

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHENZHEN XINBODA INDUSTRIAL CO., LTD., | |
| **Plaintiff,** | |
| v. | Before: Claire R. Kelly, Judge |
| UNITED STATES, | Court No. 12-00174 |
| **Defendant,** | |
| and | |
| FRESH GARLIC PRODUCERS ASSOCIATION, ET AL., | |
| **Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the sixteenth administrative review of the antidumping duty order covering fresh garlic from the People's Republic of China.]

Dated: April 17, 2020

Gregory S. Menegaz, Alexandra H. Salzman, and J. Kevin Horgan, deKieffer & Horgan, PLLC, of Washington, DC, for plaintiff Shenzhen Xinboda Industrial Co., Ltd.

Joseph H. Hunt, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were Jeanne E. Davidson, Director, Reginald T. Blades, Jr., Assistant Director, and Richard P. Schroeder, Trial Attorney. Of counsel was Brendan Saslow, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Court No. 12-00174                                                          Page 2

Michael J. Coursey and John M. Herrmann, Kelley Drye & Warren LLP, of
Washington, DC, for defendant-intervenors Fresh Garlic Producers Association,
Christopher Ranch L.L.C., The Garlic Company, Valley Garlic, and Vessey and
Company, Inc.

Kelly, Judge:    Before the court is Plaintiff Xinboda Industrial Co. Ltd.'s

("Xinboda") motion for judgment on the agency record challenging various aspects of

the U.S. Department of Commerce's ("Department" or "Commerce") final results in

the sixteenth administrative review of the antidumping duty ("ADD") order covering

fresh garlic from the People's Republic of China ("PRC").  See [Pl.'s] Mot. J. Agency

R., Aug. 30, 2019, ECF No. 45.  See Fresh Garlic from the [PRC], 77 Fed. Reg. 34,346

(Dep't Commerce June 11, 2012) (final results of the 2009–2010 admin. review of the

[ADD] order) ("Final Results"), and accompanying Issues and Decisions Memo. for

the [Final Results], A-570-831, (June 4, 2012), ECF No. 54 ("Final Decision Memo");

see also Fresh Garlic from the [PRC], 59 Fed. Reg. 59,209 (Dep't Commerce Nov. 16,

1994) ([ADD] order) ("ADD Order").

Xinboda commenced this action pursuant to Section 516A(a)(2)(B)(iii) of the

Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012).[1]  See Summons,

June 21, 2012, ECF No. 1; Compl., June 27, 2012, ECF No. 10.[2]  Xinboda challenges

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2012 edition.

[2] On December 10, 2012, this action was stayed pending the final and conclusive
determination of the appeal in the fifteenth administrative review of the ADD order
covering fresh garlic from the PRC.  See Order, Dec. 10, 2012, ECF No. 27.  The stay
ended in 2019 when the court issued its opinion and no party subsequently appealed.
See Shenzhen Xinboda Indus. Co. v. United States, 43 CIT __, 361 F. Supp. 3d 1337
(2019).

as unsupported by substantial evidence Commerce's selection of surrogate values ("SVs") for Xinboda's garlic bulb intermediate input as well as its selection of Tata Global Beverages Limited's ("Tata Tea") unconsolidated financial statements to calculate Xinboda's surrogate financial ratios. See Pl.'s Memo. Supp. Mot. J. Agency R. at 1–2, 14–44, Aug. 30, 2019, ECF No. 45-1 ("Pl.'s Br."). Defendant and Defendant-Intervenors Fresh Garlic Producers Association ("FGPA") and its individual members, Christopher Ranch L.L.C., The Garlic Company, Valley Garlic, and Vessey and Company, Inc., request that the court sustain the Final Results in its entirety. See Def.'s Resp. Pl.'s Mot. J. Agency R. at 1, 5–41, Dec. 18, 2018, ECF No. 50 ("Def.'s Br."); Def-Intervenors' Resp. Opp'n Pl.'s Mot. J. Agency R. at 1–2, Jan. 9, 2020, ECF No. 51 ("Def.-Intervenors' Br."). For the reasons set forth below, the court sustains Commerce's SV determination for Xinboda's garlic bulb intermediate input and remands for further consideration or explanation Commerce's decision to rely on Tata Tea's unconsolidated financial statements to calculate Xinboda's surrogate financial ratios.

## BACKGROUND

On December 28, 2010, Commerce initiated its sixteenth administrative review of the ADD Order on fresh garlic from the PRC, for the period of review November 1, 2009 through October 31, 2010 ("POR"), at the request of FGPA and its individual members. See Initiation of Antidumping and Countervailing Duty Admin. Reviews, 75 Fed. Reg. 81,565, 81,568–69 (Dep't Commerce Dec. 28, 2010). On

December 7, 2011, Commerce published its preliminary results.  See Fresh Garlic

from [the PRC], 76 Fed. Reg. 76,375, 76,377–80 (Dep't Commerce Dec. 7, 2011)

(prelim. results of the 2009–2010 [ADD] admin. review) ("Prelim. Results"), and

accompanying Issues and Decisions Memo for the [Prelim. Results], A-570-831, PD

134, Doc. No. INT_042256 (Nov. 30, 2011) ("Prelim. Decision Memo.").[3]  Commerce

selected, inter alia, Xinboda and Golden Bird as mandatory respondents.  See Prelim.

Results, 76 Fed. Reg. 76,376.[4]  Given that Commerce considers the PRC to be a non-

market economy ("NME"), Commerce calculated normal value by using India as the

primary surrogate country to value factors of production ("FOPs").  See Prelim.

Decision Memo. at 6, 8–18.  However, Commerce elected to apply its "intermediate

input methodology" to directly determine SVs for an intermediate input, garlic bulbs,

rather than select SVs for the FOPs used to produce that intermediate input.  Id. at

11.  As a result, Commerce approximated the SV of fresh garlic based on the value of

garlic bulbs, and selected prices of grade A and grade Super A ("grade SA") garlic

---

[3] During the sixteenth administrative review, Commerce switched from manual to electronic filings of the administrative record.  Therefore, there are two indices, one manual and the other electronic, for the public and confidential documents.  On August 6, 2012, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination, on the docket, at ECF No. 22. Citations to administrative record documents in this opinion are to the document numbers Commerce assigned to such documents in the indices.

[4] Initially, Commerce selected three additional exporters as mandatory respondents, but, following petitioners' withdrawals of their requests for review, Commerce rescinded review with respect to those exporters.  See Prelim. Results, 76 Fed. Reg. at 76,375–76.

bulbs[5] from the Azadpur Agricultural Produce Marketing Committee's "Market Information Bulletin" ("APMC Bulletin")[6] as the best available information to value Xinboda's garlic bulb input.  Id. at 12–13.  In addition, Commerce selected Tata Tea Ltd.'s ("Tata Tea") 2010–2011 unconsolidated financial statement to calculate surrogate financial ratios.  See id. at 17–18.

On June 11, 2012, Commerce published its Final Results.  See generally Final Results, 76 Fed. Reg. 34,346–49.  Commerce continued to rely on garlic prices from the APMC Bulletin, rather than the financial statements of Garlico Industries Limited ("Garlico"), to value the garlic bulb input, because the APMC Bulletin prices were publicly available, specific to the input, largely contemporaneous with the POR, tax and duty exclusive, and represented a broad market average.  See Final Decision Memo at 11–36.  Commerce adjusted the data by deducting a six percent commission reflected in those prices.  See id. at 23.  In addition, Commerce continued to use Tata Tea's financial statements to calculate Xinboda's surrogate financial ratios, finding that its production processes—albeit of tea—were most similar to Xinboda's fresh garlic processing.  See Final Decision Memo at 40–45.  Commerce noted that there

---

[5] The APMC Bulletin uses a grading system to classify garlic bulbs by size.  See Prelim. Surrogate Value Memo at Ex. 3, PD 136, Doc. No. INT_042261 (Nov. 30, 2011).

[6] The APMC comprise wholesale agricultural markets that operate on a daily basis.  See Final Decision Memo. at 18; see also Petitioners' Information Submission at App'x 7 at 1–2, PD 125, Doc. No. 7808 (July 12, 2011) ("Petitioners' Info. Submission").  Each day, the Azadpur APMC publishes prices of agricultural products, including garlic.  See Petitioners' Info. Submission at Attach. 1.

was no evidence in the financial statements that indicated the company was in receipt of countervailable subsidies.  <u>See</u> Final Decision Memo at 42.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    APMC Bulletin Prices to Value Garlic Bulbs

Xinboda challenges Commerce's decision to rely on the APMC Bulletin's pricing data to value garlic bulbs as unsupported by substantial evidence, arguing it is not the best available information on the record.  <u>See</u> Pl.'s Br. at 1–2, 14–17. Rather, according to Xinboda, Garlico's financial statements better reflect Xinboda's production process and similar purchasing power and trading; and, Garlico, like Xinboda, pays farmgate prices for large quantities of garlic bulb inputs.  <u>Id.</u> at 15–17. However, should the court sustain Commerce's use of the APMC Bulletin, Xinboda argues Commerce should rely solely on grade A garlic bulb prices, because record evidence indicates grade SA prices were subsumed into grade A prices.  Pl.'s Br. at 17–19.  In addition, according to Xinboda, Commerce must deduct certain costs and

expenses in order to bring the grade A prices closer to farmgate prices. <u>See</u> Pl.'s Br. at 20–26. Defendant counters that Commerce's decision to rely on the APMC Bulletin is supported by substantial evidence, emphasizing Commerce's preference for size-specific data and noting deficiencies in Garlico's financial statements. <u>See</u> Def.'s Br. at 5, 8–25. Further, Defendant argues that Commerce reasonably rejected arguments in the underlying proceeding that grade SA prices were subsumed into grade A prices, <u>see</u> <u>id.</u> at 25–28, and that additional adjustments to grade A prices should be made, <u>see</u> <u>id.</u> at 28–32.[7] For the reasons that follow, the court sustains Commerce's determination to rely on the AMPC Bulletin prices to value Xinboda's garlic bulb input, including grade SA garlic bulbs, and its decision not to adjust the pricing data further.

### A.    Use of APMC Bulletin Prices

In an antidumping proceeding, if Commerce considers an exporting country to be an NME, like the PRC, it will identify one or more market economy countries to serve as a "surrogate" for that NME country in the calculation of normal value. <u>See</u> 19 U.S.C. § 1677b(c)(1), (4).[8] Normal value is determined on the basis of FOPs from

---

[7] Defendant-Intervenors "fully support and endorse the points and arguments" of Defendant and raise one additional argument, namely that the court is not bound by prior court decisions involving challenges to the final results of the fifteenth administrative review. <u>See</u> Def.-Intervenors' Br. at 1–4.

[8] Dumping occurs when merchandise is imported into the United States and sold at a price lower than its "normal value," resulting in material injury (or the threat of

(footnote continued)

the surrogate country or countries used to produce subject merchandise.[9]  See id. at

§ 1677b(c)(1); see also 19 C.F.R. §§ 351.408(a)–(c) (2014).[10]  However, in certain

circumstances, Commerce will utilize its "intermediate input methodology" to apply

a SV to an intermediate input directly, as opposed to the FOPs used to yield that

intermediate input.[11]

---

material injury) to the U.S. industry.  See 19 U.S.C. §§ 1673, 1677(34), 1677b(a).  The difference between the normal value of the merchandise and the U.S. price is the "dumping margin."  See id. at § 1677(35).  Commerce imposes antidumping duties equal to the dumping margin to offset the dumping.  See id. at § 1673; see generally Dorbest Ltd. v. United States, 604 F.3d 1363, 1367 (Fed. Cir. 2010).

[9] By statute, Commerce must value FOPs "to the extent possible . . . in one or more market economy countries that are . . . at a level of economic development comparable to that of the [NME], and . . . significant producers of comparable merchandise."  See 19 U.S.C. § 1677b(c)(4)(A)–(B); see also Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Pol'y Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited Apr. 14, 2020).  Commerce prefers to use data from one primary surrogate country.  See 19 C.F.R. § 351.408(c)(2).

[10] FOPs to be valued in the surrogate market economy include "hours of labor required," "quantities of raw materials employed," "amounts of energy and other utilities consumed," and "representative capital cost, including depreciation."  See 19 U.S.C. § 1677b(c)(3).

[11] Commerce applies its intermediate input methodology when the FOPs to produce an intermediate input account for an insignificant share of total output, and the burden to value each FOP to produce that intermediate input outweighs a possible increase in accuracy in the normal value calculation.  See Fresh Garlic from the [PRC]-16th Admin. Review-Intermediate Input Methodology, PD 135, Doc. No. INT_042257 (Nov. 30, 2011) ("Intermediate Input Memo.") (citing Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 68 Fed. Reg. 37,116 (Dep't Commerce June 23, 2003) (notice of final [ADD] determination of sales at less than fair value), and accompanying Issues and Decision Memo. at 26–45, A-552-801, (June

(footnote continued)

Section 1677b requires Commerce to use "the best available information" to value FOPs.  19 U.S.C. § 1677b(c)(1).  Although Commerce has broad discretion in deciding what constitutes the best available information, see QVD Food Co., Ltd. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (noting the absence of a definition for "best available information" in the antidumping statute), it must ground its selection of the best available information in the overall purpose of the antidumping statute, calculating accurate dumping margins.  See CS Wind Vietnam Co. v. United States, 38 CIT __, __, 971 F. Supp. 2d 1271, 1277 (2014) (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).  "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review" (collectively, "selection criteria").  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014); see also Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Pol'y Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited Apr. 14, 2020).

---

16, 2003), available at https://enforcement.trade.gov/frn/summary/vietnam/03-15794-1.pdf (last visited Apr. 14, 2020)).  Commerce also applies the methodology when valuing FOPs to produce an intermediate product would lead to an inaccurate result, because a significant element of cost would not be adequately captured.  Id. (citing Carbon and Certain Alloy Steel Wire Rod from Ukraine, 67 Fed. Reg. 55,785 (Dep't Commerce Aug. 30, 2002) (notice of final determination of sales at less than fair value)).

Commerce reasonably determines that the APMC Bulletin prices are the best available information on the record to value the garlic bulb input.[12]  See Final Decision Memo. at 15–23.  Specifically, the APMC Bulletin prices satisfy Commerce's selection criteria as a specific, publicly available data source, reflecting a broad market average and reported exclusive of taxes and duties.  Id. at 15–19.  With respect to specificity, the APMC Bulletin catalogues raw garlic prices on size-based grades.  Id. at 17; see also Prelim. Surrogate Value Memo at Ex. 3, PD 136, Doc. No. INT_042261 (Nov. 30, 2011) ("Prelim. SV Memo.").  Given that "size is the key component in the pricing of garlic[,]"[13] Commerce explains that the APMC Bulletin data enables it to construct "detailed and therefore accurate size/grade-specific" normal value calculation by matching respondents' 40–55 mm garlic bulbs with grade A values and 55 mm or larger garlic bulbs with an average of grades A and SA values.

---

[12] Commerce applies its intermediate input methodology to value respondents' intermediate input garlic bulbs, because each respondent reported raw garlic inputs as FOPs, rather than garlic seed and growing factors used to produce garlic bulbs. See Prelim. SV Memo. at 2; see also Intermediate Input Memo. at 2.

[13] Commerce refers to several past reviews in explaining that size and quality are significant price-determinants of garlic bulbs.  See Final Decision Memo. at 17 (citing Fresh Garlic From the [PRC], 76 Fed. Reg. 37,321 (Dep't Commerce June 27, 2011) (final results and final rescission, in part, of the 2008–2009 [ADD] admin. review), and accompanying Issues and Decisions Memo. at 10–15, A-570-831, (June 20, 2011), available at  https://enforcement.trade.gov/frn/summary/prc/2011-16072-1.pdf (last visited Apr. 14, 2020); Fresh Garlic from the [PRC], 74 Fed. Reg. 29,174 (Dep't Commerce June 19, 2009) (final results and partial rescission of the 13th [ADD] admin. review & new shipper reviews), and accompanying Issues and Decisions Memo. at 6–19, A-570-831, (June 8, 2009), available at https://enforcement.trade.gov/frn/summary/prc/E9-14358-1.pdf (last visited Apr. 14, 2020)).

Final Decision Memo. at 17; <u>see also</u> Prelim. Decision Memo. at 13–14.  Further,

Commerce reasonably finds the APMC Bulletin data to be publicly available—posted

at Azadpur facilities, available as a pamphlet at the market, and accessible through

electronic archives—as well as representative of a broad market average, in light of

the scope of the data and the volume of garlic traded at the market.[14]  Final Decision

Memo. at 16–19.  Commerce, relying on findings in previous administrative reviews,

also determines that the APMC Bulletin prices are reported free of taxes and duties.

<u>Id.</u> at 19.  Even though the APMC Bulletin prices are not fully contemporaneous for

grade SA garlic bulbs, prices for grades A, B, and C are contemporaneous with the

POR.[15]  <u>Id.</u> at 19, 35–36.  Commerce, in light of its findings on each selection criteria,

finds that, taken together, they reveal the APMC Bulletin prices to be the best

available information to value the garlic bulb input.[16]  <u>Id.</u> at 19.

---

[14] Specifically, as Commerce explains, the APMC received "nearly 26,000 MT" of garlic from several states in India known to produce larger, high quality garlic, indicating that the APMC Bulletin prices are "geographically and temporally representative of the garlic industry in India."  Final Decision Memo at 18–19.

[15] Commerce adjusts the value of the grade SA prices to account for their non-contemporaneity.  <u>Id.</u> at 19; <u>see also</u> Prelim. Memo at 13–14 ("Because the Grade Super-A prices reported by the APMC which are on the record of this review are from 2007-2008, the Department applied a garlic-specific Wholesale Price Index to the non-contemporaneous data to make them contemporaneous to the POR.")

[16] Xinboda argues that APMC Bulletin prices are distorted by pointing to a finding in a report by the Indian Department of Agriculture & Co-operation ("AgriCorp Report") that states "[o]ver a period of time these [agricultural] markets have . . . acquired the status of restrictive and monopolistic markets[.]"  Pl.'s Br. at 24–25 (citing Xinboda Final Surrogate Value Submission at Ex. 2, PD 155, Doc. No. SCA_047683 (Jan. 6,

(footnote continued)

Although Commerce ultimately selects the APMC Bulletin data, it also considers, but reasonably rejects, the financial statements of Garlico, as a possible surrogate value alternative, because it finds that Garlico's financial statements are not specific, do not represent a broad market average, and contain discrepancies. See Final Decision Memo. at 11–13. As Commerce explains, Garlico is a company that primarily purchases and dehydrates fresh vegetables, including garlic, to make powders and flakes. Id. at 12. Farmers cultivating garlic to be dehydrated plant and harvest garlic to achieve maximum yield, without concern for size or appearance, unlike farmers that sell raw garlic. See id. Commerce, therefore, reasons that the raw garlic inputs purchased by Garlico would not be physically comparable, or specific in size and quality, to those purchased by respondents, producers of whole and peeled garlic. Id. Further, Commerce notes that Garlico's financial statements do not reflect a broad market average, because they reflect the experience of one company, rather than, as preferred, transactions between many buyers and sellers. Id. at 13. Moreover, Commerce observes several discrepancies—e.g., Garlico incurred the exact same purchase expenses for two different agricultural products in two consecutive years—that call into question the overall reliability of Garlico's financial

_____

2012) ("Xinboda SV Submission")). However, as Commerce explains, the AgriCorp Report merely demonstrates that the APMC market system "has resulted in an increase in the cost of marketing which results in farmers obtaining low prices." See Final Decision Memo. at 23; see also Xinboda SV Submission at Ex. 2 at 58. Given that Commerce selects a SV based on the price a processor would pay, not the price a farmer obtains, Commerce reasonably rejects Xinboda's argument. Final Decision Memo at 23.

statements. See id. at 13, 41; see also Final Surrogate Value Memo. at 2–3, PD 224,

Doc No. TNT_077215 (June 4, 2012) ("Final SV Memo.").[17]  Given that Garlico's

financial statements do not satisfy Commerce's selection criteria, unlike the APMC

Bulletin, Commerce reasonably selects the latter over the former to value the garlic

bulb input.[18]  Final Decision Memo. at 13.

Notwithstanding the flaws Commerce identifies with the Garlico financial

statements, Xinboda maintains that they represent the best available information on

the record to calculate the garlic bulb input, because they reflect farmgate prices,

---

[17] Commerce identifies further discrepancies in Garlico's financial statements, namely: the reported purchases of traded goods in one section does not match the purchase values in another section of the financial statements; the cost of raw garlic purchased matches the sales figure; and, the reported raw onion sales in one section does not correspond to the raw onion sales in another.  See Final SV Memo. at 2–3.

[18] Xinboda contends that Commerce does not similarly scrutinize the reliability of the APMC Bulletin prices. See Pl.'s Br. at 21 ("[T]he Department's critique of the Market Value Chain Report holds equally true for the Azadpur Market data."); see also Pl.'s Reply Br. at 16–17, Feb. 5, 2020, ECF No. 52 ("Pl.'s Reply Br.").  Alleging defect in Commerce's analysis of the APMC Bulletin does not cure the defects Commerce reasonably identifies in the Market Value Chain Report.  Indeed, Commerce answers the questions Xinboda poses in its moving brief concerning the APMC Bulletin's data collection and data quality.  Compare Pl.'s Br. at 21 with Final Decision Memo. at 18. Commerce reasonably explains that in "past cases, [the agency has] found official government publications to be reliable and credible sources of information."  Final Decision Memo. at 18 (citing Sebacic Acid from the [PRC], 69 Fed. Reg. 75,303 (Dep't Commerce Dec. 16, 2004), and accompanying Issues and Decision Memo. at 3–9, A-570-825,          (Dec.          10,          2004),          available          at https://enforcement.trade.gov/frn/summary/prc/E4-3678-1.pdf (last visited Apr. 14, 2020)).

unlike the AMPC Bulletin prices. See Pl.'s Br. at 15–17.[19] Commerce addresses, and

reasonably rejects, this argument in the underlying proceeding. See Final Decision

Memo. at 19–23. In doing so, Commerce acknowledges that even if there may be

differences between the costs embedded in the respondents' prices and the AMPC

Bulletin prices, the record demonstrates the products are fundamentally similar. Id.

at 21. Commerce explains respondents' merchandise is not sold at farmgate prices,

which it defines as "the purchase price of raw garlic as it is harvested with no further

processing or handling, and including no additional charges." Id. 19–20. Although

respondents averred in the underlying proceeding that they purchased raw garlic at

farmgate prices throughout the POR, Commerce points to record evidence that

indicates it would have been unlikely for Xinboda and Golden Bird to do so, given the

short window of garlic harvest, from May through early June. See id. at 20–21.

Rather, as respondents both noted, they purchased raw garlic from farmers that used

third-party cold storage in the months following the harvest season. Id. at 21. Even

in the absence of record evidence indicating the location of the cold storage,

Commerce reasons that the use of cold storage facilities, alone, would incur additional

---

[19] Xinboda does not identify fault in Commerce's analysis of the APMC Bulletin or
the Garlico financial statements. Rather, it points out evidence that, in its view,
indicate the superiority of the Garlico financial statements over the APMC Bulletin
to value the garlic bulb input—the very same evidence Commerce considers and
reasonably weighs in the underlying proceeding. See Pl.'s Br. at 15–17. The court
will not reweigh evidence. See Downhole Pipe, 776 F.3d at 1376.

costs on the part of raw garlic seller.  Id.[20]  In addition, Xinboda, like Golden Bird, ordered raw garlic bulbs based on bulb size, which, Commerce reasons, means that the farmer selling that garlic, to meet Xinboda's specifications, must "have gone through the raw harvested garlic, cleaned it up, sorted it based on size and type, placed it into large mesh bags, and, finally, delivered it to Xinboda's processor Dadi." Id.  Commerce points to these sorting and handling costs as additional evidence that Xinboda, as well as Golden Bird, did not pay farmgate prices.  Id.  Therefore, and in light of the type and timing of respondents' input purchases, Commerce concludes that the garlic purchased by respondents include sorting, handling, and storage costs and, therefore, was not farmgate.  Id.  Xinboda does not take issue with Commerce's foregoing analysis, and its mere assertions fail to persuade that Commerce unreasonably concludes that Xinboda did not pay farmgate prices.[21]

Xinboda also contends that its purchasing power closely matches that of Garlico.  Pl.'s Br. at 15–16.  Yet, to the extent that Garlico and Xinboda purchase

---

[20] Xinboda restates an argument from the underlying proceeding, contending that the price Garlico pays for raw garlic from local farmers, close to its processing plant, are similar to the prices that Xinboda pays; and, as further support, Xinboda points to Garlico's location in the state of Madhya Pradesh, a major garlic producing region. See Pl.'s Br. at 15–16.  However, Commerce reasonably does not consider purchasing from local or proximate farmers to bear on the issue of whether those farmers sorted, handled, and stored garlic.  See Final Decision Memo. at 20–21.

[21] In the underlying proceeding, Xinboda failed to fully define "farmgate prices."  See Final Decision Memo. at 19–20.  However, before the court, Xinboda points to the Market Value Chain Report for the definition of farmgate as "includ[ing] expenses such as sorting, grading, packaging, and loading[,]" see Pl.'s Br. at 26–27, which is unavailing.  Commerce reasonably determines, for reasons explained below, that the Market Value Chain Report is unreliable.  See Final Decision Memo. at 25–31.

Court No. 12-00174                                                                                    Page 16

similar large quantities of raw garlic, Xinboda does not explain why "[t]he correspondence between the two companies" is paramount in the selection of a SV data source, id. at 17, especially when, as Commerce reasonably determines, Garlico's financial statements do not satisfy its selection criteria and are unreliable. See Final Decision Memo. at 11–13. Therefore, Xinboda fails to undermine Commerce's reasonable decision to select the APMC Bulletin over the Garlico financial statements. See id. at 24.

## B.    Use of Grade SA Prices in APMC Bulletin

Xinboda argues that if Commerce continues to rely on the APMC Bulletin prices, it should rely solely on contemporaneous grade A prices, and exclude non-contemporaneous grade SA prices, because record evidence indicates that grade SA prices have been subsumed into grade A prices. Pl.'s Br. at 17–19. Defendant counters that Commerce's reliance on both contemporaneous and non-contemporaneous prices is supported by substantial evidence. Def.'s Br. at 17–28. Specifically, Defendant contends that Commerce reasonably rejects the record evidence on which Xinboda basis its claim as unreliable. Id. For the reasons that follow, Commerce reasonably selects contemporaneous and non-contemporaneous AMPC Bulletin prices for grade A and SA prices garlic bulbs, respectively.

Generally, in the selection of SVs, Commerce prefers to use SVs that are fully contemporaneous with the POR, because those SVs more accurately reflect a respondent's costs during the relevant POR. See Home Meridian Int'l, Inc. v. United

States, 772 F.3d 1289, 1295 (Fed. Cir. 2014).  Although Commerce must select the

"'best available information,' . . . there is no requirement that the data be perfect."

Id. at 1296.  Thus, depending on the factual circumstances, Commerce may select

non-contemporaneous data over contemporaneous data.  See id. at 1296 (recognizing

that Commerce has discretion in SV selection and may select non-contemporaneous

data).

        Commerce reasonably relies on non-contemporaneous grade SA prices from the

APMC Bulletin 2007–2008 to value certain-sized garlic bulbs.  Given that grade SA

garlic bulbs compare to a "significant portion" of raw garlic inputs processed by

Xinboda and Golden Bird, Commerce explains that using prices from the APMC

Bulletin enables the construction of more accurate normal values, despite the non-

contemporaneity of the grade SA pricing data.  See Final Decision Memo. at 32–36.

To specifically match the prices by grade reported in the APMC Bulletin with the

respondents' purchase information, Commerce uses grade A prices to value garlic

bulbs with a range in diameter from 40–55 mm and an average of grades A and SA

prices to value garlic bulbs with a diameter of 55 mm or greater.  Id. at 33.  In

addition, Commerce adjusts the prices with a garlic-specific wholesale price index to

adjust the grade SA prices to the 2009–2010 POR.  Id.

        Xinboda does not persuade that Commerce is unreasonable in selecting non-

contemporaneous grade SA prices to value its garlic bulb inputs, and it offers no

argument that Commerce should elevate contemporaneity, over specificity, in the

selection of SVs for the garlic bulb inputs.  Rather, Xinboda's argument proceeds from the mistaken premise that because no grade SA garlic was allegedly sold at the Azadpur Market during the POR, grade SA prices cannot be used to value garlic bulb inputs sized 55 mm or greater.  Pl.'s Br. at 17–19.  Xinboda bases its claim on a declaration, prepared by Xinboda, in which a researcher recounts interviews with garlic traders ("Researcher Declaration").  See id. at 18; see also Xinboda Surrogate Value Submission at Attach. Declaration, PD 148, Doc. No. EXT_047406 (Jan. 6, 2012) ("Xinboda SV Submission").   However, Commerce reasonably finds the Researcher Declaration to be unreliable, because: the researcher's observations were based on a single visit and interviews with eight vendors; the researcher's credentials were unclear; and, the researcher failed to provide details regarding the interviewed vendors so that Commerce could corroborate the Research Declaration.  See Final Decision Memo. at 31; see also Xinboda SV Submission at Attach. Declaration.  Even if reasonable minds can disagree on Commerce's assessment of the weight of evidence, the agency's determination of SVs for the garlic bulb input is consistent with its selection criteria and supported by the record.[22]  Cf. Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1376 (Fed. Cir. 2015).

---

[22] Xinboda contends that the court has "already ruled on this issue," referring to Shenzhen Xinboda Indus. Co. v. United States, 43 CIT __, 361 F. Supp. 3d 1337 (2019) ("Shenzhen III"), where the court sustained, in the fifteenth administrative review, Commerce's exclusion of grade SA prices.  See Pl.'s Br. at 19 (citing Shenzhen III, 43 CIT at __, 361 F. Supp. 3d at 1358–59).  More generally, Xinboda argues that the

(footnote continued)

### C.   Adjustments to APMC Bulletin Prices

Xinboda argues that if the court sustains Commerce's reliance on the APMC Bulletin prices to value the garlic bulb input, Commerce must deduct costs and expenses associated with bringing garlic bulbs to the Azadpur Market. See Pl.'s Br. at 20–276. Specifically, Plaintiff avers that "considerable mark-ups for transportation, commissions, taxes, loading and unloading, and wastage and weight loss" are reflected in the APMC Bulletin prices and should be deducted to more closely approximate the farmgate prices Xinboda paid. See id. at 20. Defendant counters that Plaintiff has failed to demonstrate that further adjustments than those Commerce reasonably made are warranted. Def.'s Br. at 28–32. For the reasons that follow, Commerce's decision not to further adjust the APMC Bulletin prices is sustained.

Commerce has broad discretion not only to determine what data constitutes the "best available information" to value FOPs and inputs, see QVD Food Co., 658 F.3d at 1323, but also to rely on such data without adjustment, provided its

---

court should carefully consider not only Xinboda III but two preceding decisions concerning the fifteenth administrative review, given the similarity of issues discussed in those opinions to those presently under consideration. See Pl.'s Reply Br. at 1–6. However, each administrative review is a separate segment of an antidumping proceeding and each with its own, unique administrative record, see, e.g., Jiaxing Brother Fastener Co., Ltd. v. United States, 822 F.3d 1289, 1299 (Fed. Cir. 2016). A determination must be supported by substantial evidence based on that administrative record. Further, as Defendant-Intervenors observe, "one judge of the United States Court of International Trade [("CIT")] is not bound by the decision of another judge of the [CIT]." See Def.-Intervenor's Br. at 3 (citing Algoma Steel Corp. v. United States, 865 F.2d 240, 243 (Fed. Cir. 1989)).

methodology is reasonable in light of its obligation to calculate the dumping margin as accurately as possible.  See e.g., Shakeproof Assemb. Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001); Timken Co. v. United States, 26 CIT 434, 461, 201 F. Supp. 2d 1316, 1341 (2002).  Further, Commerce has broad discretion in assessing the reliability of data. See, e.g., Vinh Hoan Corp. v. United States, 39 CIT __, __, 49 F. Supp. 3d 1285, 1320 (2015); Wuhan Bee Healthy Co. v. United States, 29 CIT 587, 593, 374 F. Supp. 2d 1299, 1304 (2005).

Commerce's decision not to apply further adjustments to the APMC Bulletin price is reasonable because the basis for those adjustments is predicated on findings contained in the Market Value Chain Report and Researcher Declaration, sources Commerce determines to be unreliable.  See Final Decision Memo 24–31.  With respect to the Market Value Chain Report—a report that provides information on garlic price, quantity, and industry—Commerce finds the report to contain numerous discrepancies, as well as missing supporting data to corroborate the findings, that call into question its reliability.  See Final Decision Memo at 24–31; see also Xinboda SV Submission at Attach. Report.[23]  Commerce chronicles its concerns at length and in detail, observing: record evidence controverts Xinboda's claim that it had

---

[23] Commerce's reliability evaluation of research reports focuses on four factors: "(1) the source and accuracy of the data; (2) explanation of the analysis/calculations; (3) whether the underlying raw data was provided; and (4) explanation of how the data was collected, sorted and analyzed."  Final Decision Memo. at 25.

commissioned the report, <u>id.</u> at 25–26;[24] there are inconsistences as to when the report was compiled,[25] <u>id.</u> at 26; and, the report lacks underlying data analysis, or an explanation of the methodology used, to support its conclusions.  <u>Id.</u>

That last discrepancy, in Commerce's view, is of "most concern," because "the lack of analysis means that the Department cannot review how the data used as the basis of the report was collected, compiled, analyzed and incorporated into, or excluded from, the final conclusions."  Final Decision Memo. at 26.  Specifically, Commerce, in examining the so-called "primary" and "secondary" sources cited in the Market Value Chain Report, finds that many are unidentified and, among those that are specifically identified, the sources do not include supporting data or documentation.  <u>Id.</u> at 26–28.

Regarding the three sources of "primary" data—information derived from meetings with garlic experts, data derived from the Global AgriSystem, and responses to questionnaires sent to growers, traders, and horticultural department officials—Commerce finds each to be deficient.  <u>Id.</u> at 26–27.   Meetings with garlic

---

[24] Specifically, Commerce observes that the first page of the report states that an exporter interested in the garlic trade commissioned the report.  Final Decision Memo. at 25; <u>see also</u> Xinboda SV Submission at Attach. Report at 1.  Although Commerce, citing confidentiality concerns, could not provide the name of that exporter, it finds that there was no record evidence to support the inference that the entity was related to Xinboda, conflicting with Xinboda's statement that it had commissioned the report.  <u>Id.</u> at 25–26.

[25] The cover letter to the report dates to early 2011, while the report itself contains garlic prices and quantities through November 2011, raising a question, in Commerce's view, as to when the report was compiled and finalized.  Final Decision Memo. at 26.

experts form the basis of data collected in Annexure 3, which lists monthly arrival prices and quantities for major agricultural markets in India; however, the Market Value Chain Report does not provide details of the meetings, how the data was obtained, and whether any adjustments were made to the data. Id. at 27; see also Xinboda SV Submission at Attach. Report at 55–65. The Market Value Chain Report also cites to Global AgriSystem data regarding three production belts— Mandsaur/Neemuch (Madhya Pradesh), Mainpuri/Gihror (Uttar Pradesh), and Kullu (Himachal Pradesh)—but neither provides the raw data underlying the analyses nor explains why the cited production belts were "important," id. at 27; see also Xinboda SV Submission at Attach. Report at 6, leaving Commerce unable to determine whether this data was "reflective of the Indian garlic market in general." Id. Similarly, the Market Value Chain Report relies on responses to questionnaires sent to the growers, traders, and horticultural department officials. Id. Although the Market Value Chain Report includes copies of the questionnaires and a list of those surveyed, it does not provide the responses, making it impossible for Commerce to evaluate whether the information collected was complete and the responses could be considered representative of the general garlic market. See id.; see also Xinboda SV Submission at Attach. Report at 68–78.

Regarding secondary information, encompassing statistics on the garlic trade and prices derived from multiple sources, Commerce explains that, in many instances, the report fails to identify the specific sources and, as a result, Commerce

has no way to confirm the report's reliance on those sources.  Id. at 27–28.  Where

citations to sources are provided, the report does not contain the underlying data used

to generate the statistics.  Id.  Further, even where the Market Value Chain Report

includes underlying data and supporting documentation, Commerce identifies

internal inconsistencies[26] and inaccuracies[27] that further undermine the reliability of

the report.  Therefore, in light of these many issues, Commerce considers the Market

Value Chain Report unreliable and declines to give it probative weight.  Id. at 29–31.

---

[26] Commerce points to the Madhya Pradesh section of the report as emblematic of its overall concerns regarding the reliability of the Market Value Chain Report.  See Final Decision Memo at 28 (citing Xinboda SV Submission at Attach. Report at 31–38).  Specifically, Commerce notes that a table entitled "Seasonal Farm Gate Prices and the Price Trend," which breaks out farmgate prices between harvesting season and the rest of the year, does not provide dates; and, a second table on the same page, entitled, "Table 4: Arrivals at APMC Neemuch, MP" ("Table 4") does not include data for certain months.  See Final Decision Memo at 28; see also Xinboda SV Submission at Attach. Report at 36.  Further, Commerce, in attempting to reconcile the data in the first table with the second, observes that the average prices in the second table were much higher than the average prices in the first table.  See Final Decision Memo at 29.  Turning to Table 4 in particular, Commerce explains that it expected that the data in Table 4 would be based on the "primary" data in Annexure 3, which also provides arrival prices and quantities for major markets in India.  Id.  However, the figures do not match, and the Market Value Chain Report does not explain the discrepancy.  Id.  These inconsistencies, as Commerce reasonably concludes, call into question the accuracy of information throughout the report as well as indicate that the information collected may not have been properly analyzed.  Id.

[27] Even though the internal trade sections and supporting data at Annexure 4 are based on data collected from the Food and Agricultural Organization of the United Nations ("FAO"), Commerce notes that the data in the report do not match the cited FAO data.  Final Decision Memo. at 30; see also Xinboda SV Submission at Attach. Report at 65–67.  Without an explanation or reason for the discrepancies, Commerce reasonably concludes that the report relied on inaccurate or secondary sources for the FAO statistics, or the researcher erred in compiling data.  Final Decision Memo. at 30.

Likewise, Commerce expresses concerns about the reliability of the Researcher Declaration that Xinboda submitted.  <u>See</u> Final Decision Memo at 31 (citing Xinboda SV Submission at Attach. Declaration).  Commerce questions the researcher's qualifications, because it is not clear whether this individual was a market researcher or a field expert, when the researcher only attested to working in "import/export trade for over 20 years."  <u>Id.</u>  Further, the researcher chronicled observations based on a single visit to the Azadpur Market and on interviews with eight unidentified vendors. <u>Id.</u>  Xinboda adduced no other additional information for Commerce to corroborate the researcher's claims.  <u>Id.</u>  Finally, Commerce notes that the researcher's affidavit was signed and notarized in 2011, but also contains an unexplained stamp date of 2010.  <u>Id.</u>  Taken together, Commerce reasonably finds that the Researcher Declaration is unreliable .  <u>Id.</u>

Xinboda does not challenge Commerce's explanations or its reliability determinations,[28] but, instead, persists in its view that it paid farmgate prices, which the APMC Bulletin prices do not reflect, and, further, that the Market Value Chain

---

[28] Rather, Xinboda refers to several articles that "corroborate" the Market Value Chain Report and a field study therein.  <u>See</u> Pl.'s Br. at 24–26 (citing Xinboda SV Submission at Exs. 3–4).  However, pointing to extraneous commentary does not resolve the internal inconsistencies, discrepancies, and missing documentation and data Commerce reasonably identifies in its analysis of the Market Value Chain Report.  Xinboda asks the court to substitute its judgment for Commerce's and reweigh evidence, which it cannot do.  <u>See</u> <u>Downhole Pipe</u>, 776 F.3d at 1376.

Report and Researcher Declaration provide a basis to make adjustments[29] that match Xinboda's purchasing experience.  See Pl.'s Br. at 20–24.  However, as explained above, Commerce reasonably determines that Xinboda did not pay farmgate prices. See Final Decision Memo. at 21.  Moreover, Commerce acknowledges that although Xinboda did not purchase its garlic bulb inputs at a market like Azadpur Market, there was no information on the record demonstrating that the prices Xinboda paid and the APMC Bulletin prices were fundamentally different.  Id. at 24.  Commerce has no obligation to directly replicate the production experience of Xinboda, if doing so would result in a determination of a less accurate SV for the garlic bulb input.  See, e.g., Nation Ford Chemical v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

Moreover, in rehashing the same arguments that Commerce reasonably rejects in the underlying proceeding, Xinboda asks the court to reweigh evidence, which it cannot.  Further it tasks the court with making a reliability determination when Commerce has discretion to evaluate the reliability of evidence and when Xinboda has not come forward with evidence that undermines Commerce's reliability findings. See Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) ("[D]rawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); see also Vinh Hoan Corp., 39 CIT at __, 49 F. Supp. 3d at 1320.  Thus, Commerce reasonably determines

---

[29] Specifically, Xinboda contends that "considerable mark-ups for transportation, commissions, taxes, loading and unloading, and wastage and weight loss" should be removed from the APMC Bulletin prices.  See Pl.'s Br. at 20.

that the Market Value Chain Report and the Researcher Declaration are unreliable, as Commerce highlights numerous and undisputed inconsistencies and discrepancies that reasonably justify the concerns it raises, and that further adjustment to the APMC Bulletin prices, based on the information contained in those two sources, is not warranted.

## II.   Selection of Financial Ratios

Xinboda argues that Commerce reliance on Tata Tea's unconsolidated financial statements to derive financial ratios is unsupported by substantial evidence. See Pl.'s Br. at 27–45.  According to Xinboda, Commerce erroneously chose the unconsolidated financial statements of Tata Tea, an integrated producer of branded tea, over those of Garlico, a non-integrated producer garlic flakes, which processes garlic in a manner comparable to respondents.  Id. at 27–28, 31–41.  Xinboda further contends that Commerce fails to address record evidence indicating that Tata Tea's financial statements were distorted by the receipt of countervailable subsidies.  Id. at 41–45.   Defendant counters that Commerce reasonably selects Tata Tea's unconsolidated financial statements over Garlico's because Tata Tea's production process is most similar to Xinboda's and Commerce found Garlico's financial statements to be unreliable.  Def.'s Br. at 32–38.  In addition, Defendant argues that Commerce reasonably determines that Tata Tea's financial statements did not contain sufficient evidence of subsidization.  See Def.'s Br. at 38–41.  For the following

Court No. 12-00174                                                          Page 27

reasons, Commerce's decision to rely on Tata Tea's statements is remanded for further explanation or consideration.

As explained above, in NME cases, Commerce determines normal value on the basis of FOPs used to produce subject merchandise from a market economy surrogate country or countries.  See 19 U.S.C. § 1677b(c)(1).  FOPs to be valued in the surrogate market economy include "hours of labor required," "quantities of raw materials employed," "amounts of energy and other utilities consumed," and "representative capital cost, including depreciation."  See id. at § 1677b(c)(3).  After calculating the total value of FOPs, Commerce will add to normal value "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  Id. at § 1677b(c)(1).  To value general expenses and profit, Commerce calculates surrogate financial ratios that the agency derives from the financial statements of one or more companies that produce identical or comparable merchandise in the primary surrogate country.  See 19 C.F.R. § 351.408(c)(4); Dorbest Ltd. v. United States, 604 F.3d 1363, 1368 (Fed. Cir. 2010).  Specifically, Commerce calculates separate surrogate financial ratios from the surrogate financial statement for selling, general, and administrative expenses ("SG&A"); manufacturing overhead; and, profit.  See, e.g., Manganese Metal From the [PRC], 64 Fed. Reg. 49,447, 49,448 (Dep't Commerce Sept. 13, 1999) (final results of second admin. review).[30]

_____

[30] To do so, Commerce analyzes each financial statement line item and either assigns

(footnote continued)

Court No. 12-00174                                                                    Page 28

By statute, Commerce "may disregard price or cost values without further investigation if [it] has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price of cost values or if those price or cost values were subject to an antidumping order." 19 U.S.C. § 1677b(c)(5).    Congress thus tasked Commerce to "avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices" when valuing FOPs.  Omnibus Trade and Competitiveness Act of 1988, Conference Report to Accompany H.R. 3, H.R. Rep. No. 100-576 at 590-91 (1988) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24; see also Nation Ford, 166 F.3d at 1378.  In doing so, Commerce is not expected "to conduct a formal investigation to ensure that such prices are not dumped or subsidized," but is instead to "base its decision [as to whether there is 'reason to believe or suspect'] on information generally available to it at that time."  H.R. Rep. No. 100-576 at 590-91, 1988 U.S.C.C.A.N. at 1623-24. Moreover, whether a determination is supported by substantial evidence is based on the whole record, which includes evidence that detracts from its weight.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Tudor v. Dep't of Treasury, 639 F.3d 1362, 1366 (Fed. Cir. 2011).

---

the line item value to a particular category—i.e., raw materials, labor, energy, manufacturing overhead, finished goods, and profit—or excludes the value from its calculation.    Commerce then calculates separate surrogate financial ratios—for manufacturing overhead, SG&A, and profit—based on the total value of each category.  Manganese Metal From the [PRC], 64 Fed. Reg. at 49,448.

Commerce has not adequately explained why its choice of Tata Tea's financial statements to calculate surrogate financial ratios is reasonable in light of record evidence that suggests that the company is or may be the beneficiary of subsidies. Instead, Commerce focuses narrowly on the financial statements' line items and fails to address record evidence indicating subsidization. Specifically, Xinboda placed on the record loan documents filed with the Government of India that show the company's receipt of packing credits and export credits. See Xinboda Final Surrogate Value Submission at Ex. 33, PD 155, Doc. No. SCA_047683 (Jan. 6, 2012) ("Xinboda Final SV Submission").[31] Each loan document[32] is a hypothecation agreement, a type of secured loan, where Tata Tea pledges collateral, e.g., movable assets, to obtain a

---

[31] Xinboda notes that, in the past, Commerce has determined export and packing credits to constitute countervailable subsidies. See Pl.'s Br. at 44–45 (citing Polyethylene Terephthalate Film, Sheet, and Strip from India, 73 Fed. Reg. 75,672 (Dep't Commerce Dec. 12, 2008) (final results of countervailing duty admin. review), and accompanying Issues and Decision Memo. at 4–5, C-533-825, (Dec. 5, 2008), available at https://enforcement.trade.gov/frn/summary/india/E8-29482-1.pdf (last visited Apr. 14, 2020); Certain Hot-Rolled Carbon Steel Flat Products from India, 74 Fed Reg. 20,923 (Dep't Commerce May 6, 2009) (final results and partial rescission of countervailing duty admin. review), and accompanying Issues and Decision Memo., C-533-821, (Apr. 29, 2009), available at https://enforcement.trade.gov/frn/summary/india/E9-10496-1.pdf (last visited Apr. 14, 2020)).

[32] Xinboda points to three loan documents: first, a "Supplemental Agreement of Hypothecation of Goods and Assets for Increase in the Overall Limit" with the State Bank of India, dated December 16, 2008; second, a "Deed of Hypothecation of Current Assets" with Axis Bank Limited of Kolkata, dated October 30, 2009; and, an "Unattested Deed of Hypothecation" with the Bank of Baroda, dated October 30, 2009. See Pl.'s Br. at 42; see also Xinboda Final SV Submission at Ex. 33.

Court No. 12-00174                                                    Page 30

credit.  See generally id.[33]  The terms of those loan documents include the receipt of

export credits, packing credits, and export packing credits.  See id.[34]  At least one loan

document stipulates that the loan is provided at below market rate.  Id.[35]  Tata Tea's

financial statements appear to catalogue receipt of these loans at Schedule 3 under

the line item "Working Capital Facilities," which describes the constituent loans as

"[s]ecured by way of hypothecation of inventories, crop, book debts and movable

assets, other than plant and machinery and furniture, of the holding company."  See

Chengwu Yuanxiang Surrogate Value Comments at Ex. 2 at 107, PD 13, Doc No.

EXT_021742 (Aug. 11, 2011) ("Chengwu SV Cmts.").[36]  Given that a "subsidy" may

take the form of a loan by a government authority that confers a benefit in the form

of more favorable lending terms than a recipient could obtain on the market, see 19

---

[33] For example, in Tata Tea's "Unattested Deed of Hypothecation" with the Bank of Baroda, the collateral includes, inter alia, "ALL the current assets of the Borrower, namely, stock of raw material, work-in-progress, finished goods, consumable stores, spares[.]"  See Xinboda Final SV Submission at Ex. 33.

[34] The "Supplemental Agreement of Hypothecation of Goods and Assets for Increase in the Overall Limit" with the State Bank of India provides for an export credit of Rs 50 crore; the "Deed of Hypothecation of Current Assets" with Axis Bank Limited of Kolkata confers a packing credit of Rs 14 crore; and, the "Unattested Deed of Hypothecation" with the Bank of Baroda specifies a packing credit of Rs 14 crore.  See Pl.'s Br. at 42; see also Xinboda Final SV Submission at Ex. 33.

[35] The "Supplemental Agreement of Hypothecation of Goods and Assets for Increase in the Overall Limit" specifies that the loan is provided at "2.75% below SBAR," when SBAR is 13%.  See Xinboda Final SV Submission at Ex. 33.

[36] As Xinboda points out, Tata Tea's 2010–2011 financial statement generally indicates the receipt of subsidies, noting, with respect to fixed assets, "[s]ubsidies receivable from government in respect of fixed assets are deducted from the cost of respective assets as and when they accrue."  See Chengwu SV Cmts. at Ex. 2. at 82.

Court No. 12-00174                                                    Page 31

U.S.C. § 1677(5), the loan documents and financial statements, together, suggest that

Tata Tea's financial statements reflect subsidized prices.  Even though Commerce

not only "note[s] instances in which the company may have received export incentive

or other general subsidies" in the financial statements but also acknowledges that

"Xinboda has placed loan documents on the record to demonstrate that Tata Tea has

received subsidies[,]" Commerce states, without any analysis or explanation, that it

"has found no evidence of these loans in the financial statements."[37]  Final Decision

Memo. at 43.  Commerce's failure to engage with this evidence is not reasonable.

    Commerce's apparent position is that it may rely on the financial statements

of a company that "may have received export incentive or other general subsidies" so

long as the Department has not previously found "that the[] subsidies were received

pursuant to a specific program . . . determined to be countervailable."  See Final

Decision Memo. at 43.  If this a practice upon which Commerce relies, on remand,

Commerce should clarify its practice and, further, explain why it is reasonable, in

light of evidence of countervailable subsidies in this case.[38]  .Although Congress did

---

[37] Defendant argues that Commerce found "insufficient evidence of subsidization." Def.'s Br. at 38.  However, Commerce neither scrutinized Tata Tea's financial statement given Xinboda's allegations nor considered possible detracting evidence, both analytic exercises that would shed light on whether there was sufficient evidence of subsidization.  Instead, Commerce merely states that it "found no evidence" of alleged subsidies.  Final Decision Memo. at 43.

[38] Commerce points to its practice of relying financial statements "as is" in calculating surrogate financial ratios.  See Final Decision Memo. at 43 (citing Certain Frozen

                                                       (footnote continued)

not intend for Commerce to undertake a formal investigation as to whether prices are

subsidized, it did instruct Commerce to base its decision "on information generally

available to it at that time."  H.R. Rep. No. 100-576 at 590-91, 1988 U.S.C.C.A.N. at

1623-24.  Commerce fails to address record evidence of possible subsidization and

fails to explain why such evidence would not suffice to constitute a "reason to believe

or suspect" that the reported prices in Tata Tea's statements are subsidized.  Here,

because Commerce does not consider information on the record regarding Tata Tea's

receipt of subsidies, it unreasonably selects Tata Tea's financial statements to

calculate surrogate financial ratios, which, irrespective of Plaintiff's other concerns

regarding Tata Tea's financial statements, merits remand.

## CONCLUSION

In accordance with the foregoing, it is

**ORDERED** that Commerce's determination to rely on the AMPC Bulletin

prices to value Xinboda's garlic bulb intermediate input, including grade SA garlic

---

Warmwater Shrimp From the [PRC], 72 Fed. Reg. 52,049 (Dep't Commerce Sept. 12, 2007) (notice of final results and rescission, in part, of 2004/2006 [ADD] admin. and new shipper reviews), and accompanying Issues and Decisions Memo. at 8–12, A-570-893, (Sept. 5, 2007), available at https://enforcement.trade.gov/frn/summary/prc/07-4495-1.pdf (last visited Apr. 14, 2020)).  However, accepting financial statements as they are does not explain how a reasonable examination of Tata Tea's financial statements yields no evidence of loans or justifies Commerce's apparently cursory assessment of "information generally available to it at that time," namely the loan documents on record.  H.R. Rep. No. 100-576 at 590-91, 1988 U.S.C.C.A.N. at 1623-24.

Court No. 12-00174                                                                    Page 33

bulbs, and its decision not to adjust the APMC Bulletin prices further is sustained; and it is further

**ORDERED** that Commerce's decision to rely upon Tata Tea's financial statements for the calculation of surrogate financial ratios is remanded for further explanation or consideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing of its remand redetermination.


                                                    /s/ Claire R. Kelly
                                                    Claire R. Kelly, Judge


Dated:        April 17, 2020
              New York, New York